Scott McCALL, Appellant,

v.

The STATE of Texas, Appellee.

No. B14–88–230–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 2, 1989.

Rehearing Denied Nov. 30, 1989.

Larry Urquhart, Brenham, for appellant.

Jana K. Miller, Houston, for appellee.

Before MURPHY, ROBERTSON and SEARS, JJ.

## OPINION

SEARS, Justice.

This is an appeal from a felony conviction for aggravated promotion of prostitution. A jury found Appellant guilty of the offense and assessed punishment, enhanced by a prior felony conviction, at twenty years confinement in the Texas Department of Corrections and a fine of $10,-000. We reverse and enter a judgment of acquittal.

Appellant raises seven points of error on appeal. In points one and two he challenges the sufficiency of the evidence to support the conviction as alleged in the indictment. Since appellant asserts insufficiency of the evidence, a careful review of the facts is appropriate.

In November 1987, Dallas Police Officers Steven Claggett and John Nichols began investigating Imaginations, an escort agency, after receiving a complaint about an ad published by the agency in This Week in Texas, a gay oriented magazine. The ad included both Dallas and Houston phone numbers. Officer Claggett called the Dallas number and scheduled an interview with a male who identified himself as "Mark". Claggett testified that during the interview he answered personal questions concerning his physical statistics and sexual preferences. He also testified that he declined Mark's request to undress and masturbate until he obtained an erection.

Officer Nichols testified he interviewed with "Mark" on December 1, 1987, and answered similar questions and refused similar requests. He further testified that on December 10 or 11, 1987, he phoned the Houston number and spoke to appellant's codefendant, Mike Smallwood, and requested "escort" work in Houston. Nichols testified that Smallwood told him he could work in Houston and could see a client of the agency in Dallas. Smallwood phoned Nichols the following day and arranged for him to meet the client at a Dallas hotel. On December 11, 1987, Nichols met the client in his hotel room and determined the client desired to engage in sexual contact. Nichols formulated an excuse and left.

On December 16, 1987, Claggett called the Houston number and arranged an interview with Smallwood using his true name. Appellant and Smallwood interviewed Claggett and told him he could begin working for Imaginations immediately. On December 18, 1987, Officers Claggett and Nichols obtained and executed a search warrant on Imagination's Houston office. Appellant and Smallwood were arrested the same day.

Appellant asserts in points of error one and two that the evidence fails to establish Officers Claggett and Nichols were prostitutes as the indictment alleged. The indictment reads in part that Appellant did "then and there unlawfully and knowingly own, invest in, finance, control, supervise and manage a prostitution enterprise using

more than one prostitute, including J.B. NICHOLS and S.B. CLAGGETT."

The state correctly argues it was unnecessary to allege the names of the prostitutes in the indictment. *Brownwell v. State,* 644 S.W.2d 862, 865 (Tex.App.— Tyler 1982, no writ). However, where an unnecessary matter is descriptive of that which is legally essential to the charged crime, it must be proven as alleged, even though needlessly stated. *Polk v. State,* 749 S.W.2d 813, 816 (Tex.Crim.App.1988). Before reviewing the sufficiency of the evidence, we must determine whether listing the officers as prostitutes in the indictment is descriptive of a legally essential element or if it is merely surplusage.

The elements of the offense with which appellant is charged are (1) a person; (2) knowingly; (3) owns, invests, finances, controls, supervises, or manages; (4) a prostitution enterprise; (5) that uses two or more prostitutes. TEX.PENAL CODE ANN. § 43.04(a) (Vernon 1974). The state pled more than was necessary by including the names of officers Nichols and Claggett in the indictment. Such unnecessary words or allegations in an indictment may be rejected as surplusage if they are not descriptive of that which is legally essential to charge a crime. *Windham v. State,* 638 S.W.2d 486, 487 (Tex.Crim.App.1982); *Matthias v. State,* 695 S.W.2d 736, 738 (Tex.App.—Houston [14th Dist.] 1985, pet. ref'd.) Since establishing the use of two or more prostitutes is a necessary element of the offense, we find the inclusion of the officers in the indictment legally essential to the charges of the crime. The proof must support the allegations or the evidence will be insufficient to support a conviction. *Franklin v. State,* 659 S.W.2d 831, 833 (Tex.Crim.App.1983).

The proper standard of review for a sufficiency of the evidence question is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v.*

*State,* 769 S.W.2d 234, 238 (Tex.Crim.App. 1989). The state asserts for purposes of this prosecution Officers Nichols and Claggett were "prostitutes." We disagree.

The term "prostitute" is not expressly defined by statute; however, the term is capable of only one meaning—a person who engages in prostitution. *Smithwick v. State,* 762 S.W.2d 232, 234 (Tex.App.—Austin 1988, pet. ref'd.). TEX.PENAL CODE ANN. § 43.02 (Vernon 1988), provides "a person commits an offense if he knowingly *offers to engage, agrees to engage, or engages in sexual conduct for a fee.*" (emphasis added). The state contends Nichols became a prostitute for purposes of prosecution when the agency dispatched him to meet a client who reportedly was into "body worship" and who had pre-authorized a $170.00 charge for the meeting.

Officer Nichols testified he met the client in his hotel room, determined the client desired to have sex with him and left. Nichols did not describe any offer to engage or agreement to engage in sexual contact with the client for a fee. Nor did he describe any conversation in which appellant or Smallwood instructed or asked him to engage in sexual contact with the client. Instead, he testified Smallwood informed him the client was into "body worship," and because *his* definition of "body worship" included sexual contact, he was able to determine the client desired to have sex with him. The state's own witness had previously testified "body worship" frequently involved no sexual or physical contact. The state's only evidence that Nichols was acting as a prostitute was his assignment as an "escort" and the authorization of a charge on the client's credit card. These actions do not satisfy the statutory definition of prostitution as defined in § 43.02.

The state also contends Officer Claggett acted as a prostitute for purposes of this prosecution. The record is devoid of any evidence to support this contention. Officer Claggett interviewed in both Dallas and Houston to go to work for the agency. Claggett testified that following the Houston interview appellant and Smallwood

stated he could begin working for the agency immediately. The state adduced no evidence that either appellant or Smallwood requested Officer Claggett to engage in sexual activity for a fee. Moreover, neither dispatched Claggett to act as an escort for the agency. The state's only evidence was several messages left at Claggett's hotel following the Houston interview. The state did not establish either the content or purpose of the messages; hence, any interpretation as to the significance of such messages would be pure conjecture.

The state put on two witnesses who allegedly worked for the agency. One witness admitted he was a prostitute, the other denied being a prostitute. The state failed to prove an element of the offense; ie. "that uses two or more prostitutes." The evidence is insufficient to prove either officer offered to engage, agreed to engage, or actually engaged in sexual activity. We sustain appellant's first and second points of error; therefore, we need not address points of error three through seven.

We reverse the judgment of the trial court and enter a judgment of acquittal.

ROBERTSON, Justice, dissenting.

I respectfully dissent from the conclusion of the majority that the evidence is insufficient to sustain the conviction. It is therefore necessary to set forth the facts in detail.

In response to a complaint from a citizen, Dallas Police Vice Officers J.B. Nichols and S.B. Claggett began an investigation of an "escort agency" called Imaginations which ran advertisements in a gay oriented magazine called *This Week in Texas*, or TWIT. One of the advertisements, introduced before the jury, read: "Houston/Dallas/Fort Worth/San Antonio. !!! ATTENTION !!! MUSCULAR MEN! SMOOTH MEN! HAIRY MEN! HANDSOME MEN! MASCULINE MEN! ALL MEN! Earn $70 to $1000 per week as escort-companion. Dallas, Ft. Worth call (214) 526–5703 Houston, call (713) 541–2742." Another read: "Houston. Dallas Houston Austin San Antonio ESCORTS * MODELS COMPAN-IONS IMAGINATIONS has friendly men for all occasions Honest and Discreet Credit Cards Honored Contact Gandy @ (713) 541–2742."

Following Officer Claggett's telephone call to the Dallas number for an appointment, he appeared at the address given him for an interview with a person introducing himself as Mark, whom the officer later determined to be Francis Joseph Collins. Collins began the interview, recording on a form the officer's responses to questions concerning "my physical statistics, my sexual preferences and my penis size and whether or not I had been circumcised." Collins then instructed the officer, who was using the name Stephen Horner, to remove his clothes. After the officer complied, Collins instructed him to masturbate in order to obtain an erection, but the officer declined, giving as his excuse that he had just taken some narcotics and couldn't relax. Nevertheless, Collins offered to help and reached for the officer's penis stating "Let me help you with that, it's part of my job." Claggett pushed Collins' hands away and redressed. The officer was to return "the following Saturday" for a photo session where two photographs in full suit, two in casual clothing and two totally nude "with a turgid penis or an erection" were to be taken.

Officer Nichols also contacted the Dallas telephone number shown in the TWIT advertisement and, securing the address, made an appointment for an interview. He, like Officer Claggett, interviewed with Collins who asked and recorded the same type information including hair color, height, weight, penis size, general body type and sexual preferences. Collins requested that Nichols remove all his clothes, which he did, and that he masturbate in order to reach an erection, which he declined, stating that he had gotten into poison ivy. He then redressed and the interview continued. Nichols testified that in answering questions about his sexual preferences, he stated that he "was rather new to that type of thing and I told him I was basically bisexual and he advised me if I were to expand my sexual preferences I

would be more likely to make more money with the company." Nichols stated that he, too, was to return for a photo session in which photographs, one in a business suit, one in underwear and one nude, were to be taken, but no discussion of nude modeling took place. Collins told him he would mail the notes taken in the interview to Houston and that the agency would contact him through "somebody in Houston."

Within a few days, Nichols called the Houston telephone number listed in the ad and talked to Mike (Smallwood, a co-defendant of and jointly tried with appellant). Nichols informed Smallwood he was coming to Houston and wanted to make some extra money while he was here. Smallwood responded he could find work for him in Houston and "besides that he had somebody in Dallas, if I was still in Dallas, I could take care of them for the company." Nichols testified that Mike called him the following day and instructed him to go to the Anatole Hotel in Dallas and go to a certain room number where Howard Fink was residing. Mike explained that Fink "was into body worship" and had already arranged for payment of $170 for the "service". Nichols testified he already had a basic idea that body worship was, generally, "you would remove your clothing, the person would have sexual contact with you." Nichols testified that he went to the hotel and called upon Fink as instructed. After he determined that Fink "wanted to have sex with me", he left. Nichols contacted Mike who asked him why he left the room. Nichols told him that the hotel didn't show Howard Fink registered in the room (which was true according to the records of the front desk) and "I was afraid he was a police officer and, therefore, I was not comfortable with the date." Nichols further testified that, as instructed, he called Mike again at which time Mike informed him that "the client was quite upset that [he] didn't return. He determined that it was a legitimate client, didn't figure there was any need for me to have not returned."

Because Collins had informed Officer Claggett during his interview that the Imaginations Escort Agency was a Hous-

ton-based operation, Claggett and Nichols came to Houston a few days later to further their investigation. After contacting local law enforcement authorities for assistance, Officer Claggett called the Houston telephone number for Imaginations and "Mike" answered the telephone. Using his true name, Claggett arranged an employment interview for that evening. When he arrived at the apartment, "Gandy", later determined to be appellant Scott McCall, opened the security door and ushered him into the apartment. Mike Smallwood entered the room from a rear bedroom. Claggett was asked to sit at a desk and Smallwood, sitting behind the desk, removed a sheet of paper. Smallwood and McCall then began the interview of Officer Claggett. Claggett's cover story to appellant and Smallwood was:

> My purpose for being there was originally I was in Dallas and I had a boyfriend who was married in Houston and the boyfriend and I were lovers and he was more or less funding me, taking care of me. I told him that I'd been caught by him messing around and that he was going to move me down to Houston, keep a better eye on me but keep a short leash. He was going to put me up in a hotel until the condo became vacant, but he'd only fund my food and lodging, that's why I was seeking employment with the agency.

During the interview, Smallwood asked Claggett whether he "preferred" men or women and Claggett told him he preferred men. Claggett testified he asked both appellant and McCall if they had any documentation of a client's preferences "so that I would know what that client preferred, what type of sexual intercourse they preferred so it wouldn't come as a surprise to me." In response to a question of whether there were any limitations as to the types of clients that he would not care to be an escort for, Claggett answered that he preferred no "bondage or S & M," explaining to the jury that the term "bondage" meant "a person that derives pleasure from being tied up or tying someone up" and "S & M" is "a person that derives pleasure from

either being beaten up or doing the beating." Claggett testified that Smallwood told him that he (Claggett) could make more money if he was "more versatile", explaining to the jury that the term was referred to in the "homosexual community" as "one who gives oral or anal intercourse."

Claggett identified as State's Exhibit No. 1 the application for employment he completed at the time of the interview with appellant and Smallwood, testifying as to those portions he completed. He identified that portion of the reverse side of the application, entitled "IDENTITY", which Smallwood filled in during the interview. The "identity" section was divided into two columns—"PREFERENCES" and "LIMITATIONS". Under "preferences" were the letters "M", "W", "HO", "BI", "HE", "10?", and under "limitations" were the words "color", "age", "sex" and "interviewer's opinion." Claggett testified that he observed Smallwood make checkmarks under these headings as the interview progressed and based upon this observation he knew that of the letters which were checked as applicable to him, "M" meant men, "W" meant women, "BI" meant bisexual and "HE" meant heterosexual. He further stated that Smallwood asked him to rate himself on a scale from one to ten, that he responded with the number "9" and that Smallwood placed that number next to "10?". Under the "LIMITATIONS" column, Smallwood wrote "black" beside the word "color" because Claggett stated he did not prefer black men because "the genitals were too large." Beside "age", Smallwood wrote the number "50" as an age range. Following "sex", Smallwood wrote the codes "X12 Y12 6½C." Claggett testified that the coded letters "X12" meant that he would both "give and receive" oral intercourse; that the letters "Y12" meant that he would "perform anal intercourse and accept anal intercourse"; and that the letters "6½c" meant that his penis was 6½ inches long and circumcised.

Concerning compensation, Claggett stated that appellant and Smallwood explained that for a minimum two-hour date the escort received $130, of which $70 went to the escort and $60 went to the agency. If "any additional time was accrued" both the escort and the agency took 50 percent of it.

Following the interview, appellant and Smallwood told Claggett he "could begin immediately and wanted to know if I could be available that evening for a date." When Claggett returned to his hotel shortly thereafter, there were four telephone messages from the agency. He did not return them but instead sought and obtained a search warrant.

The search of the apartment where Claggett interviewed resulted in the seizure of various records. Claggett identified State's Exhibits Nos. 3 and 14 as files "on the escorts sent out." The file contained a form for each of 168 clients which contained the client's name, telephone number, address and other information. Additionally, for each time an escort filled a date, the card indicated the name of the escort, the date and in some cases, the amount of money paid.

Claggett identified State's Exhibit No. 4, seized during the search, as a list of the "escorts, actual employees of the company," containing the names of some 64 "escorts". By the side of each name was the "escort's" telephone number, age, height, weight, chest size, waist size, hair color, eye color, facial description, body build and talents (which contained the coded letters and numbers discussed above).

Also seized in the raid and introduced before the jury as State's Exhibits Nos. 6 and 11 were 23 "Engagement Sheets" which were daily compilations showing the date, the client, the client's address, the name of the escort, how payment was made and the "time in/time out" with the client. The state also introduced the merchant's copy of numerous credit card invoices seized during the search along with copies of the agency's bank records secured during the investigation.

The state called one of the escorts, Dwan Despierre, who testified he was a homosexual and had worked for appellant and Smallwood through "Imaginations" as an escort. He estimated that he had filled

some 20 or 30 dates, the "majority" of which involved sexual contact. He stated that the number of escorts working for Imaginations varied "because you have some people that work briefly and then they wouldn't work for awhile and then you'd have somebody come in and work for a week or two at any given time. I would say roughly 20 at any given time but it could go up to 50, 60." He stated that he lived with appellant and Smallwood at the apartment (from which the business was operated) for some time and assisted in answering the telephone which rang "twenty-four hours a day, seven days a week."

Despierre identified Lee Drummond as another of the escorts employed by appellant and Smallwood and testified that he, along with Lee Drummond, had participated in a three-way sexual encounter on one occasion with a client of Imaginations. Additionally, he named John McLaughlin as a popular escort of the agency and testified that both Mike Smallwood and appellant acted as escorts and went on engagements with clients.

The state called Lee Drummond as a witness. While he acknowledged working as an escort for Imaginations, he denied being "gay" and generally "couldn't remember" when questioned about specific instances. He did acknowledge, however, that he had acted as an escort for Bob Warren on several occasions but couldn't remember how many because he didn't have "any records." He acknowledged that on one occasion he and Dwan Despierre were with a client, and while he "couldn't be sure" any sexual activity took place, he "assumed it did." On cross-examination Drummond testified that he never, while working as an escort, had sex with a client for money. On redirect examination, he stated that he acted as an escort to Bob Warren on March 2, March 8, March 13, April 10, April 16, April 25, May 22, June 8, June 11, June 20, July 18, August 3, August 5, September 16 and September 18 and that while Warren had paid for his services each time, he (Drummond) had no special talents which would explain the number of visits.

The State then called Bob Warren who acknowledged he was a client of Imaginations, having learned about the agency through the TWIT magazine. He stated that he called the agency on numerous occasions and had spoken to both Mike and Gandy (appellant) to request an escort for both himself and his male lover, Paul, who lived with him and who had suffered a stroke. He stated that Lee Drummond came to his home on many occasions as a result of his telephone requests to Imaginations for an escort. When Drummond came to the home, there would be sexual contact on occasion between the three individuals.

The majority finds that since the indictment alleged the two police vice officers to be prostitutes and the evidence shows that they were *not in fact* prostitutes, the evidence is insufficient to sustain the conviction. I disagree.

The indictment, omitting its formal parts, alleged that on a certain date, Scott McCall "did then and there unlawfully and knowingly own, invest in, finance, control, supervise and manage a prostitution enterprise using more than one prostitute, including J.B. Nichols and S.B. Claggett."

In his charge to the jury, the judge defined prostitution and prostitution enterprise:

"Prostitution" is *offering to engage, agreeing to engage,* or engaging in sexual conduct in return for a fee payable to the person offering or agreeing to, or so engaging in sexual conduct. (emphasis added)

A "prostitution enterprise" means a plan or design for a venture or undertaking in which two or more persons *offer to, agree to,* or engage in sexual conduct in return for a fee payable to them. (emphasis added)

The facts that neither officer was actually a prostitute and that neither intended to actually complete a sexual date with anyone is immaterial. Officer Claggett testified that "my undercover guise [was] a prostitute" and "it was [my] intention to be hired in the position of a prostitute." Officer Nichols testified that he "offered to

engage in sex for money." This testimony meets all requirements under the court's charge. The evidence shows without any dispute that appellant and Smallwood *intended to hire and did hire* Claggett and Nichols as prostitutes. The fact that neither was actually a prostitute has nothing to do with the sufficiency of the evidence. The majority fails to apply the well-established test for determining the sufficiency of the evidence in a criminal case. When we examine the evidence in the light most favorable to the verdict, a rational trier of fact could easily find beyond a reasonable doubt the essential elements of the offense. That is all that is required.

I respectfully dissent.